IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KLAMATH-SISKIYOU WILDLANDS        )
CENTER, ENVIRONMENTAL             )       2:10-cv-02350-GEB-CMK
PROTECTION INFORMATION CENTER,    )
KLAMATH FOREST ALLIANCE, and      )
CENTER FOR BIOLOGICAL DIVERSITY,  )       ORDER DENYING PLAINTIFFS'
                                  )       MOTION FOR PRELIMINARY
                Plaintiffs,       )       INJUNCTION
                                  )
        v.                        )
                                  )
PATRICIA A. GRANTHAM, Klamath     )
National Forest Supervisor, and   )
UNITED STATES FOREST SERVICE,     )
                                  )
        Defendants,               )
                                  )
        and                       )
                                  )
SOUTH BAY TIMBER, LLC and ROUGH   )
AND READY TIMBER, LLC             )
                                  )
        Defendant                 )
        Intervenors.              )
_____ )

        Plaintiffs   seek   a   preliminary   injunction   enjoining
implementation of the United States Forest Service ("Forest Service")'s
Panther Fire Salvage and Reforestation Project (the "Project") in the
Klamath National Forest, "excluding timber harvest units 205, 206, 207,
and 208, pending a resolution of the merits of this case." (Pls.' Mot.
for Prelim. Inj. 2:17-19.) Plaintiffs argue a preliminary injunction is
required because "the Forest Service did not take the requisite 'hard
look' at the foreseeable environmental consequences of logging the

burned area . . . . Consequently, Defendants' decision to move ahead with the [Project] is arbitrary and capricious, and should be enjoined until the agency prepares an adequate environmental analysis." (Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Mot.") 1:6-11.) Defendants oppose the motion. Argument on the motion was heard on September 27, 2010.

## I. LEGAL STANDARD

### A.   Preliminary Injunctions

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."   <u>Winter v. Natural Res. Def. Council, Inc.</u>, --- U.S. ----, 129 S. Ct. 365, 376 (2008). Plaintiffs seeking a preliminary injunction must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." <u>Sierra Forest Legacy v. Rey</u>, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing <u>Winter</u>, 129 S. Ct. at 374).

Further, the Ninth Circuit's "'serious questions' approach survives <u>Winter</u> when applied as part of the four-element <u>Winter</u> test." <u>Alliance for the Wild Rockies v. Cottrell</u>, --- F.3d ----, 2010 WL 3665149, at *5 (9th Cir. 2010). "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the <u>Winter</u> test are also met." <u>Id.</u>

### B.   Review of Federal Agency Decisions under the APA

Plaintiffs' motion is based on three claims: violation of the National Environmental Policy Act ("NEPA"); violation of the Appeals

Reform Act ("ARA"); and violation of the National Forest Management Act ("NFMA").   These claims are reviewable on the administrative record under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701-706.  The Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc).

Under the APA, a reviewing court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." Earth Island Institute v. U.S. Forest Service, 442 F.3d 1147, 1156 (9th Cir. 2006)(citation omitted). Rather, the reviewing court should reverse an agency decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." The Lands Council v. McNair, 537 F.3d at 987 (quotation and citation omitted). "This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen, --- F.3d ----, 2010 WL 3194619, at *5 (9th Cir. 2010).

## II. BACKGROUND

### A.   The Panther Fire

The Panther Fire was started by a lightning storm on July 22, 2008. (Administrative Record ("AR") 7 at 1; AR 19 at 3.)  Despite suppression actions, the Panther Fire and other nearby fires consumed approximately 63,000 acres of the Klamath National Forest by the fall of

2008.  Id.  The Panther Fire made its final and most intense run on October 1, 2008, burning 13,000 acres before rain stopped its advance. Id.  A combination of topography, fuel loading, and unfavorable weather caused intense fire activity, resulting in considerable tree mortality, particularly in and around the Project area. (AR 19 at 3-4, and Photo 1-1.) The intensity of the Panther Fire also reduced the conifer seed source needed to naturally reforest the landscape. Id. at 4. "[H]eavy fuel loadings and overhead snag hazards in stands and along roads in the project present unsafe conditions for the public and for forest workers." Id.  "Roadside hazards in particular jeopardize safe ingress and egress in future wildfire events." Id.

**B.   The Project's Purpose and Scope**

The Project is located within the Elk Creek watershed on the Happy Camp Ranger District of the Klamath National Forest. (AR 7 at 2.) The Project's stated purposes are to 1) facilitate conifer revegetation, 2) provide for public and forest worker safety, and 3) recover economic value from timber lost to the Panther Fire.  (AR 7 at 1; AR 19 at 6-7.)

The Project involves the salvage harvest of dead and dying trees on approximately 214 acres of burned forest lands with treatment of small fuels left after harvest and reforestation with conifer seedlings, as well as the removal of "hazard" roadside dead and dying trees along approximately 12 miles of road encompassing 322 acres. (AR 7 at 1-3; AR 19 at 8-9, 21-23, 127.)

The salvaged timber will be predominantly logged by suspended cable methods to avoid disturbance of sensitive soils. (AR 19 at 8, 21.) No new access roads will be constructed except for "[a]pproximately 200 feet of temporary landing access road . . . , which would be decommissioned following completion of harvest activities." Id. at 21.

4

In addition, the Project will incorporate mitigation measures and utilize Best Management Practices to minimize any environmental impact from the logging contemplated by the Project, including retention of large snags to preserve habitat values. See AR 7 at 3; AR 19 at 28-43, and App. B. Further, the Project includes protective measures designed to minimize impacts to the Project acreage located in Riparian Reserves. (AR 19 at 8, 28-30.)

###    C.   The Project's History

The Forest Service developed "the Panther Fire Salvage and Reforestation [Environmental Assessment] to incorporate both the salvage/reforestation activities and roadside hazard treatments previously analyzed [under two prior environmental assessments]." (AR 7 at 1.) "These activities were combined with additional fuels treatments to meet project purposes." Id.

The Forest Service announced the availability of the Project's Environmental Assessment on May 19, 2010, and accepted public comments until September 18th, 2010. (AR 17.) The Decision Notice and Finding of No Significant Impact was issued for the Project on August 23rd, 2010. (AR 7.)

The Forest Service requested an Emergency Situation Determination ("ESD") for the Project based upon an alleged "immediate threat to human health and safety posed by the rapidly deteriorating snags within stands and along Forest access roads in the project area" and "a substantial loss of economic value to the Federal Government" if the Project were stayed pending an administrative appeal. (AR 503 at 1, see also AR 502 and 504.) The Chief of the Forest Service found that the Project qualifies as an "emergency situation" under 36 C.F.R. § 215.2 and granted the ESD on August 23, 2010. (AR 501.) The ESD states a delay

in implementing the Project until after any administrative appeal would likely result in a no-bid sale of the salvage timber due to the further deterioration of the wood, resulting in an estimated monetary loss of $565,000. Id. at 1. Without a commercial salvage, federal funding would be necessary to accomplish the Project's hazard tree removal and fuel treatment objectives.  Id. at 1-2; see also AR 504 and 505.

### III.   DISCUSSION

### A.   Likelihood of Success on the Merits

#### 1.   NFMA Claim

Plaintiffs argue the Project violates the National Forest Management Act by proposing to conduct salvage logging within Riparian Reserves without first demonstrating that the harvesting is necessary to attain Aquatic Conservation Strategy ("ACS") Objectives, and "that future coarse woody debris needs are presently met." (Mot. 14:13-17.) Defendants counter the AR "amply supports" that the Project is designed to further ACS objectives. (Defs.' Mem. in Opp'n to Mot. for Injun. ("Opp'n") 10:26-27.)

The NFMA, 16 U.S.C. § 1600 et seq., governs the Forest Service's management of National Forests. NFMA and its implementing regulations provide for forest planning and management at two levels: the forest level and the individual project level.  See generally 16 U.S.C. § 1604; see also Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729-30 (1998).

At the forest level, the Forest Service develops a Land and Resource Management Plan ("LRMP" or "Forest Plan"), which is a broad, long-term planning document for the entire forest. "These plans operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses . . . but do

not directly compel specific actions." <u>Citizens for Better Forestry v.</u>
<u>U.S. Dep't of Agric.</u>, 341 F.3d 961, 966 (9th Cir. 2003).

At the project level, site-specific projects are to be
consistent with the governing LRMP.  <u>Id.</u>; <u>see also Inland Empire Pub.</u>
<u>Lands Council v. U.S. Forest Serv.</u>, 88 F.3d 754, 757 (9th Cir. 1996);
<u>see generally</u> 16 U.S.C. § 1604(I).  Once the Forest Plan is approved,
the Forest Service implements the Plan by approving or denying
site-specific actions. <u>Forest Guardians v. U.S. Forest Serv.</u>, 329 F.3d
1089, 1092 (9th Cir. 2003).

The Klamath National Forest Land and Resource Management Plan
is the governing Forest Plan for Klamath National Forest. (AR 518.) That
plan also incorporates direction from the Northwest Forest Plan
("NWFP"), which was adopted in 1994 to provide a regional strategy for
managing the National Forests of Northern California, Oregon, and
Washington. <u>Id.</u> at 1-1.

The NWFP established a system of land "allocations," which
govern the activities that may or may not be conducted in each
allocation.  (AR 529 at A-4, A-5.) One of those allocations, "Riparian
Reserves," designates areas "along streams, wetlands, ponds, lakes and
unstable or potentially unstable areas where the conservation of aquatic
and riparian-dependent terrestrial resources receives primary emphasis."
(AR 528 at 7.)

"Recognizing that riparian terrain 'offer[s] core areas of
high quality stream habitat,' and that watersheds 'are crucial to
at-risk fish species . . . and provide high quality water,' the [NWFP]
'prohibit[s] or regulate[s] activities in Riparian Reserves that retard
or prevent attainment of the Aquatic Conservation Strategy objectives.'"
<u>Oregon Natural Resources Council Fund v. Goodman</u>, 505 F.3d 884, 893-94

(9th Cir. 2007) (quoting <u>Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v.</u>
<u>Nat'l Marine Fisheries Serv.</u>, 265 F.3d 1028, 1031-32 (9th Cir. 2001)).
Accordingly, timber harvest is prohibited within Riparian Reserves under
the NWFP except as follows:

a) "Where catastrophic events such as fire . . . result in
degraded riparian conditions," salvage and fuelwood cutting is permitted
if "required to attain Aquatic Conservation Strategy objectives."

b) Trees may be salvaged "only when watershed analysis
determines that present and future coarse woody debris needs are met and
other ACS objectives are not adversely affected."

c) Silvicultural practices may be applied to "control
stocking, reestablish and manage stands, and acquire desired vegetation
characteristics needed to attain ACS objectives." (AR 529, at
C-31-C-32.)

The NWFP sets forth nine ACS objectives, which include:

3. Maintain and restore the physical integrity of
the aquatic system, including shorelines,
banks, and bottom configurations.

4. Maintain and restore water quality necessary
to support healthy riparian, aquatic, and
wetland ecosystems . . . .

. . . .

5. Maintain and restore the sediment regime under
which aquatic ecosystems evolved . . . .

(AR 529 at B-11.)

Discussion of Plaintiffs' arguments supporting their NFMA
claim follows.

### a) Widths of Riparian Reserves

Plaintiffs argue the Forest Service has improperly altered the
widths of Riparian Reserves within the Project area contrary to the NWFP

and the Elk Creek Ecosystem Analysis. (Mot. 10:23-11:9.) Defendants counter "the Forest Service has not proposed any modification of Riparian Reserve widths. In fact, the Project maintains the recommended widths." (Opp'n 11:26-12:1.)

Plaintiffs do not cite any portion of the AR in support of their argument that the Project alters Riparian Reserve widths. Further, the Hydrology Report indicates the Project maintains the recommended widths. (AR 29 at 6.) Therefore, Plaintiffs have not shown that the Project improperly changes the Riparian Reserve widths established in the NWFP.

**b)   Scientific Studies concerning Post-Fire Logging in Riparian areas**

Plaintiffs also argue "[e]xpert researchers have . . . concluded that post-fire logging in riparian areas causes irreparable harm" to the environment, including a decrease in coarse woody debris and accelerated surface erosion. (Mot. 11:10-11, 12:11-12.)

Defendants rejoin,

Plaintiffs cite various articles that discuss riparian issues generally as well as snippets from the administrative record taken out of context, while ignoring the larger picture. That larger picture . . . reveals that the Panther Project, with its site-specific treatments and design features, will have a beneficial effect on Riparian Reserves, ameliorating the ill effects that Plaintiffs describe (which are largely the after-effects of the fire itself), while avoiding any further impacts. Plaintiffs' discussion of the general potential for adverse effects to riparian areas fails to account for the specifics of the project they are challenging. Because the Panther Project's treatments in Riparian Reserves, including fuels reduction and reforestation, will accelerate the development of a conifer overstory and will stabilize streambanks, Plaintiffs' generic concerns are off the mark and fail to establish a violation of NFMA.

(Opp'n 12:6-15) (citation omitted).

Plaintiffs rely upon two scientific studies in support of their position that post-fire logging will have a significant impact on riparian areas. (AR 401, 411.) The studies do not concern this Project's effects on the Riparian Reserves within the Project area, however. Further, the Project's Environmental Assessment and its component specialist reports indicate the Project will actually benefit Riparian Reserves by promoting rapid conifer regeneration. (AR 19 at 6, 64, 78; AR 28 at 4, 21-23; AR 29 at 10-11, 21-22.) For example, the Project's "Decision Notice and Finding of No Significant Impact" states:

**Cumulative Watershed Effects**

. . . .

With the resource protection measures integrated in the Selected Alternative, implementation will not increase the potential for landsliding or debris flows, nor negatively affect water or soils.

The Selected Alternative will decrease the likelihood of high severity fire through fuels treatments - thus further decreasing the risk of landsliding - and would have a long-term positive effect on hillslope stability through rapid conifer reforestation. Design features such as retention of large logs in steep burned channels would maintain natural debris flow processes.

The Selected Alternative would have negligible to minor direct, indirect and cumulative effects on water quality and land stability within the project area. Risks to the watersheds from the proposed action are low. By quickly effecting conifer regeneration, the net root reinforcement would remain high enough to prevent failures. There would be a long-term increase in stream shading as riparian vegetation recovers. The functioning of project area riparian reserves would continue to improve over the current post-fire condition. Rapid conifer reforestation in riparian reserves would augment naturally recovering riparian vegetation and ground cover, thereby improving the riparian reserves' efficiency as a sediment filter.

1  (AR 7 at 15-16 (emphasis in original).)

2          c)  **Aquatic Conservation Strategy Objectives**

3          Plaintiffs further argue:

4          Defendants have failed to demonstrate that salvage
           logging and cable and ground-based yarding within
5          Riparian Reserves is <u>required</u> to meet ACSOs, and
           that the watershed analysis for the Elk Creek
6          Watershed concluded that future woody debris needs
           are presently met . . . . Consequently, the
7          decision to permit salvage logging within Riparian
           Reserves is . . . not in accordance with NFMA.

8

9  (Mot. 14:14-17 (emphasis in original).)

10         Defendants counter the Project is designed to promote ACS

11  objectives, and meets coarse woody debris needs. (Opp'n 10:26-27, 11:17-

12  18.) Defendants explain with citation to the administrative record:

13         In this case, the reforestation component of the
           Panther Project is anticipated to promote rapid
14         conifer regeneration, which in turn will augment
           naturally occurring riparian vegetation and ground
15         cover, thereby improving stream shading and
           sediment filtration, as well as reestablishing
16         soil-binding root mass, which will increase bank
           stability. [AR 19 at 6, 64.] These effects,
17         together with the increase in fire resiliency from
           fuels treatments, will therefore assist in the
18         attainment of ACS objectives. [AR 19, at 78; AR 29
           at 21-22] . . . . In addition, the Project calls
19         for mitigation measures to avoid adversely
           affecting ACS objectives and thus avoid any
20         significant adverse impacts to Riparian Reserves,
           such as sediment input or bank destabilization. [AR
21         19 at 29-30, 128-29; AR 24 at 1; AR 28 at 5-8; AR
           29 at 5-6; AR 35 at 4-6].

22

23  <u>Id.</u> at 11:12-23.

24          Plaintiffs' counsel provided additional argument on this issue

25  at the September 27, 2010 hearing, contending Defendants' citations to

26  the AR suggest only that the fuel treatment and reforestation components

27  of the Project promote ACS objectives; nothing in the AR suggests that

28  the salvage harvest is necessary to attain them. Plaintiffs' counsel

also argued that without information in the AR specifically explaining why logging is required to attain ACS objectives, the Project's proposed salvage harvesting in Riparian Reserves violates the NWFP, and thus, the NFMA.

However, the AR indicates both that coarse woody debris needs are being met and the Project is necessary to attain the following ACS objectives: improving hillside stability, increasing stream shading, and improving sediment filtration efficiency. (AR 19 at 29-30, 64, 133, 138; AR 28 at 7; AR 29 at 10, 21.) Further, information in the AR indicates logging is needed to implement the reforestation and fuel treatment portions of the Project. (AR 29 at 11.) Regarding this, the Hydrology Report states:

> The Panther Fire has denuded all Riparian Reserves in the project area. For this reason it is imperative that site preparation and planting occur in the Riparian Reserve areas.
>
> For effective site prep to occur, the riparian areas need to be slashed with handpiling of non-commercial material. Commercial timber needs to be harvested to open up the ground for planting. At this point there is no conifer stream shading, and no remaining riparian buffer to act as a sediment filter.

Id.

Therefore, Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of their NFMA claim.

**2.  NEPA Claim**

Plaintiffs argue Defendants violated NEPA by failing to prepare an Environmental Impact Statement ("EIS") for the Project. (Mot. 16:5-11.) Defendants rejoin an EIS was not required because the Environmental Assessment prepared for the Project demonstrated that it

will not significantly affect the human environment. (Opp'n 13:4, 13:11-12.)

NEPA is a procedural statute enacted to ensure the federal government makes major decisions significantly affecting the environment only after considering the impacts of those decisions and exploring possible alternatives. 42 U.S.C. §§ 4321, 4331; 40 C.F.R. § 1501.1. Its primary purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before making a final decision to proceed. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989). Although NEPA establishes procedures by which federal agencies must consider the environmental impacts of their actions, it does not dictate the substantive results of agency decision making. Robertson, 490 U.S. at 350; High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 639 (9th Cir. 2004).

NEPA requires federal agencies to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c). "Where an agency is unsure whether an action is likely to have 'significant' environmental effects, it may prepare an [Environmental Assessment ("EA")]: a 'concise public document' designed to '[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement . . . .'" Klamath-Siskiyou Wildlands Center v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir. 2004) (quoting 40 C.F.R. § 1508.9). If, after preparing an EA, "the agency concludes . . . there is no significant effect from the proposed project," the federal agency may issue a Finding of No Significant Impact ("FONSI") in lieu of preparing an EIS. Native Ecosystems Council v. U.S. Forest Service, 428 F.3d 1233, 1239 (9th Cir. 2005); 40 C.F.R. § 1508.13. The FONSI must include "a

convincing statement of reasons" to explain why a project's impacts are not significant. <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d at 1212 (quotation omitted).

Two broad factors must be considered in determining whether a project will significantly affect the environment: context and intensity.  40 C.F.R. § 1508.27. "Context simply delimits the scope of the agency's action, including the interests affected." <u>National Parks & Conservation Ass'n v. Babbitt</u>, 241 F.3d 722, 731 (9th Cir. 2001). "Intensity relates to the degree to which the agency action affects the locale and interests identified in the context part of the inquiry." <u>Id.</u> In evaluating a project's intensity, NEPA regulations require the agency to consider a number of "intensity factors" including:

> (2) The degree to which the proposed action affects public health or safety.

> (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

> . . . .

> (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

40 C.F.R. § 1508.27(b).  "One of these factors may be sufficient to require preparation of an EIS in appropriate circumstances." <u>Oceans Advocates v. U.S. Army Corps of Engineers</u>, 402 F.3d 846, 865 (9th Cir. 2005) (citation omitted).

To prevail on a NEPA claim that an agency improperly failed to prepare an EIS, "a plaintiff need not show that significant effects will in fact occur. It is enough for the plaintiff to raise substantial questions whether a project may have a significant effect on the

environment." <u>Blue Mountains Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998) (quotation omitted).

Plaintiffs argue an EIS was required for the Project because of the presence of several "significance factors," including the Project's implementation in "ecologically critical areas;" its threatened violation of federal law; and its affect on public health and safety. (Mot. 16:5-8, 16:13-15, 16:25-26, 17:11-12; 18:4-6, 18:25-27.)

### a) Ecologically Critical Areas

Plaintiffs argue an EIS was required because the Project is located "within a Tier 1 watershed, . . . proposes salvage logging within Riparian Reserves, . . . is partially located within a late-successional reserve . . . [and] is partially located within the Johnson Inventoried Roadless Area." (Mot. 16:13-14, 16:25, 17:11-12.)

Defendants counter "Plaintiffs do no more than observe that certain types of land allocations . . . exist within or near the Project area and then jump to the conclusion that the Project may have 'significant' environmental effects. The Panther Project will not have any significant effect on Riparian Reserves . . . LSRs or IRAs . . . ." (Opp'n 14:13-19.) Defendants further argue Plaintiffs have waived any argument concerning the Project's potential impact on late-successional reserves (LSRs) because they did not raise any issues concerning LSRs in their comments on the Project's Environmental Assessment. (Opp'n 14:20-22.)[1]

Plaintiffs do not cite to any portion of the AR that supports their argument that there is a risk of environmental harm to

---

[1]  Defendants' waiver argument need not be decided since it is clear Plaintiffs have not shown that this issue presents a serious question or that they are likely to succeed on the merits of this issue.

"ecologically critical areas;" they simply cite to portions of the AR, which discuss that ecologically sensitive areas are within or near the Project area. However, Plaintiffs have not shown that the mere presence of these ecologically sensitive areas within or near the Project area raises a substantial question that the Project may have a significant effect on the environment. See Indiana Forest Alliance, Inc. v. United States Forest Service, No. NA 99-214-C-H/G, 2001 WL 912751, at *13 (S.D. Ind. July 5, 2001) ("The mere presence of unique features does not require the Forest Service to prepare an EIS.") aff'd, 325 F.3d 851 (7th Cir. 2003); see also Presidio Golf Club v. National Park Service, 155 F.3d 1153, 1162 (9th Cir. 1998) (holding the Park Service did take the Project's proximity to historical resources into account, and the EA adequately considered the unique characteristics of the Presidio and its ecological resources).

Further, the Environmental Assessment specifically considered the Project's effects on these areas and indicates they will not be significantly affected. (AR 19 at 1, 6, 28-30, 60-61, 64, 74, 78, 128-129.) Only six acres of proposed treatment (hazard tree removal and fuels treatment) lie within LSRs, which the EA concludes "[will] not substantially change the character of the LSR or its current or future potential habitat for northern spotted owls." Id. at 1, 74. The EA similarly explains for the Project's proposed hazard tree removal and fuel treatment within the Johnson Inventoried Roadless Area ("IRA"), the activities affect only 0.002% of its 9,300 acres, and are consistent with all applicable regulations. (AR 19 at 60, 61.) "No timber harvest (other than the removal of roadside hazard trees) or road construction is proposed." Id. at 60. The Environmental Assessment further states:

> Implementation of [the Project] would not change the roadless character or affect the area's potential for inclusion in the Wilderness System at a later date . . . . The area proposed for activity is small and project design would minimize potential adverse resource effects. Proposed management is consistent with Forest Plan direction for the respective management areas.

(AR 19 at 61.) Lastly, the Project's effects on Riparian Reserves are discussed above under section III(A)(1).

Therefore, Plaintiffs have not shown that the Project's proposed activities in or near these "ecologically critical areas" require the preparation of an EIS.

### b)   A Threatened Violation of Federal Law.

Plaintiffs also argue the Project threatens the violation of federal law, i.e. the Northwest Forest Plan, by "salvage logging within Riparian Reserves," which requires preparation of an EIS. (Mot. 18:5-6.)

Defendants rejoin, there is no threatened violation of the Northwest Forest Plan because both the NWFP and the Klamath National Forest LRMP "allow timber harvest and other forest management activities in Riparian Reserves when implementing such actions will advance and not otherwise harm ACS objectives." (Opp'n 16:12-14.)

Plaintiffs' argument has already been addressed in the discussion above on their NFMA claim. Plaintiffs have not raised a serious question on the merits that the Project violates the NFMA. Therefore, this factor does not weigh in favor of requiring an EIS.

### c)   Effect on Public Health & Safety.

Lastly, Plaintiffs argue the Project's EA, DN/FONSI and Emergency Situation Determination state the Project is necessary to protect public and firefighter safety; which is a "[factor] that

trigger[s] the preparation of an EIS." Plaintiffs conceded at the September 27, 2010 hearing that this argument is "counterintuitive" since the record indicates the Project will have a positive, rather than negative, effect on public safety. However, Plaintiffs argue an EIS is required whenever a project will significantly affect public safety, regardless of whether the effect is beneficial or harmful.

The issue, however, is whether an EIS is required because the proposed action "'may cause significant degradation of some human environmental factor.'" Ocean Advocates v. U.S. Army Corp of Engineers, 402 F.3d 846, 864 (quoting Idaho Sporting Cong. v. Thomas, 137 F.3d 1146, 1149 (9th Cir. 1998). Plaintiffs' argument is disconnected from this issue. Therefore, the Project's expected positive effect on public safety does not require preparation of an EIS.

For the above reasons, Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of their NEPA claim.

### 3. ARA Claim

Plaintiffs argue Defendants violated the ARA by issuing an Emergency Situation Determination, which obviates the usual stay of a proposed action pending resolution of an administrative appeal, without the required showing. (Mot. 19:6-13.) Defendants counter the ESD was properly issued both to address hazards threatening human health and safety as well as to avoid substantial loss of economic value to the federal government. (Opp'n 18:17-22.)

Under the ARA, Forest Service decisions subject to administrative appeal are automatically stayed pending appeal. 16 U.S.C. § 1612, Note (e). However, no stay of the decision is imposed if "the Chief of the Forest Service determines that an emergency situation

exists . . . ." Id.   Regulations establishing the appeal procedures state an "emergency situation" includes:

> A situation on National Forest System (NFS) lands for which immediate implementation of all or part of a decision is necessary for relief from hazards threatening human health and safety or natural resources on those NFS or adjacent lands; or that would result in substantial loss of economic value to the Federal Government if implementation of the decision were delayed.

36 C.F.R. § 215.2 (2010).

Plaintiffs raise five primary arguments in support of their ARA claim, which are addressed in turn below.

### a)   Failure to Use an Economic Expert

Plaintiffs argue the Forest Service was required to use an economist to perform the Project's economic analysis since the ESD was based on economic reasons. (Mot. 19:14-15, 19:23-26.) Plaintiffs rely on a NEPA regulation and the Forest Service Handbook to support this argument. Id. The NEPA regulation Plaintiffs cite, 40 C.F.R. 1502.6, requires the use of "an inter-disciplinary approach" in preparing Environmental Impact Statements.  Similarly, the portions of the Forest Service Handbook cited by Plaintiffs require use of an interdisciplinary approach in planning and decisionmaking, which may have an impact on the environment. FSH 1909.15.12.

Defendants counter that 36 C.F.R. § 215.10(b) sets forth the standard for issuing an ESD, not the authorities cited by Plaintiffs, and § 215.10(b) requires only that the Forest Service base its determination "upon examination of the relevant information." (Opp'n 21:10-15.)  Defendants further argue, even if the law upon which Plaintiffs rely applies to the issuance of an ESD, it does not require the specific use of an economist because 40 C.F.R. § 1502.6 commands

1    only that the "disciplines of the preparers shall be appropriate to the

2    scope and issues identified . . . ." Id. at 22:9-11. Defendants contend

3    special expertise in economics was not required to support the ESD in

4    this case because the person who prepared the Project's economic

5    analysis is trained in forest management and is qualified to analyze

6    salvage timber's loss in value over time. (Opp'n 22:9-15; AR 19 at 80.)

7        Defendants' arguments are persuasive. Plaintiffs have not

8    shown that the Forest Service was required to use an economist to

9    support issuance of the ESD, nor that the Project's economic analysis

10   was flawed.

11   **b)    The Project Is a Net Financial Loss to the**

12   **Government**

13       Plaintiffs further argue the Project "will result in negative

14   income[;]" therefore, there is no information to support "the agency's

15   conclusion that the proposed project would result in a substantial loss

16   of economic value to the government if it [is] not implemented

17   immediately." (Mot. 20:2-7.)

18       Defendants counter "[i]t is irrelevant that . . . total costs

19   would exceed total receipts . . . . Economic loss occurs 'even if sale-

20   preparation costs outstrip the expected revenue derived from the salvage

21   sale.'" (Opp'n 20:6-7 (quoting League of Wilderness Defenders-Blue

22   Mountains Biodiversity Project v. U.S. Forest Service, No. Civ. 04-488-

23   HA, 2004 WL 2642705, at *14 (D. Or. Nov. 19, 2004).)

24       Plaintiffs have not shown that a net loss to the government

25   renders the ESD invalid. The relevant inquiry in determining whether or

26   not the delay in implementing a project will result in a substantial

27   financial loss to the government is the difference in economic value to

28   the government in implementing the plan under the normal time line

versus on an expedited basis. The AR indicates the federal government will lose a substantial amount of money if the Project is delayed pending an administrative appeal. As documented in the "Panther Fire Salvage Emergency Situation Analysis" prepared in support of the ESD request:

> The Final Environmental Assessment and Decision Notice are scheduled to be approved on July 30, 2010. Implementation could begin on August 11, 2010. By October 15, wet weather operating restriction will be in effect and operations will be limited depending upon the weather patterns. All of the volume in the salvage project could be harvested if the sale is not appealed. Several interest groups have expressed strong indications that they will appeal a decision to salvage timber. The appeal process timelines of 105 days would extend the time until award of the sale from August 11 to November 24. Since wet weather operating restrictions go into effect on October 15, it is likely that little or no volume would be harvested at this late date. Delay of implementation will result in the timber deteriorating substantially before it can be removed, impacting the revenue that can be derived from the sale of sawtimber. Given current market conditions, the additional deterioration resulting from the delay greatly increases the risk that the timber may not sell at all. The ability of the Klamath National Forest to accomplish the purpose and need for the project is therefore strongly tied to the timing of the salvage harvest treatments, which in turn is dependent upon the NEPA timeline and obtaining an Emergency Situation Determination.
>
> . . . .
>
> Value loss (stumpage receipts) would be approximately $278,062 dollars for the project, or approximately 34% of the total timber value. It is likely that the losses would be much higher because contractors would most likely not bid on the timber sales due to costly logging systems and a high risk of timber deterioration, particularly under current market conditions. The total value lost would in that case match the total value of approximately $565,000. In California, there are numerous examples where delay has caused no bid sales: the Gap Fire discussed above, Blue Fire on the Modoc, and Manter Fire on the Sequoia, among others.

1  (AR 504 at 3, 9.)

2          **c)    Two Year Delay in Issuing the ESD**

3          Plaintiffs also argue:

4          [T]he   Forest   Service   declared   an   identical
           "emergency" in 2009 [when it developed the earlier
5          Panther   project],   and   then,   in   the   face   of
           litigation, withdrew [it]. The agency waited an
6          entire year before moving forward with the project
           again in August 2010 . . . . [T]hese facts do not
7          support   the   need   for   an   emergency   situation
           determination.

8

9  (Mot. 20:12-17.)

10         Plaintiffs   rely   on   the   Ninth   Circuit's   recent   ruling   in

11 Alliance for the Wild Rockies v. Cottrell in support of their argument

12 that the two year delay in implementing the project post-fire belies the

13 determination that there was an "emergency situation." Alliance for the

14 Wild Rockies v. Cottrell, --- F.3d ----, 2010 WL 3665149, at *11 (9th

15 Cir. 2010), amended by --- F3d. ----, 2010 WL 3665149 (9th Cir. 2010).

16 In Cottrell, the Ninth Circuit held the plaintiffs raised "serious

17 questions" on the merits of their ARA claim, which challenged an ESD

18 determination, noting "the Forest Service has not been able to make

19 clear to us, either in its briefing or at oral argument, why it waited

20 so long to request an ESD. The Rat Creek fire occurred in August and

21 September of 2007. The ESD was requested, and then issued, almost two

22 years later." Id.

23         Defendants counter, Plaintiffs' argument "is off the mark"

24 because an ESD was requested and issued in connection with the 2009

25 iteration of the Panther project. (Opp'n 20:15-21.) Defendants state:

26         [T]he Agency withdrew the 2009 ESD and DN/FONSI
           because   it   determined   that   it   was   necessary   to
27         perform additional NEPA analysis on the hazard tree
           portion of the Project. That decision was certainly
28         no concession that there was no public safety
           threat   at   the   time,   that   the   timber   was   not

1          deteriorating, or that the Project could ultimately
2          fail to obtain bids.

3 (Opp'n 20:19-21.)

4          The Project is distinguishable from the ESD challenged in

5 Cottrell because here Defendants provide a reasonable explanation for

6 the delay in implementing the project and seeking the ESD. As described

7 in the "Panther Fire Salvage Emergency Situation Analysis,"

8          The Interdisciplinary Team (IDT) has analyzed the
           potential environmental effects of this proposed
9          action under the National Environmental Policy Act.
           Project scoping was initiated to prepare an
10         Environmental Assessment in December 2009. The IDT
           published the Draft Environmental Assessment (EA)
11         on June 16, 2009 for the Panther Fire Salvage
           Project (2009). A Decision Notice was issued on
12         August 10, 2009. On August 21, 2009 that decision
           was withdrawn. Scoping for a new project, Panther
13         Fire Salvage and Reforestation (2010), began in
           January 2010. The IDT developed a new purpose and
14         need as well as a new proposed action and published
           an EA for the Panther Fire Salvage and
15         Reforestation project on May 19, 2010. A decision
           on this project is expected on July 30, 2010.
16

17 (AR 505 at 1.)

18         Cottrell is distinguishable from this case in other respects

19 as well. First, the ESD at issue in Cottrell was based only upon

20 threatened economic loss to the federal government, whereas here, the

21 ESD is based upon both threatened economic loss and a danger to human

22 health and safety. Second, in Cottrell the economic loss was valued

23 between $16,000 - $70,000. Here the threatened loss is upwards of

24 $250,000. (AR 505 at 9.) Third, the ESD in Cottrell, was improperly

25 based, in part, on a local economy argument, which was not a basis for

26 the ESD in this case. (AR 501 at 2.)

27

28

### d)   Delay's Impact on Local Economy

Plaintiffs next argue the Forest Service improperly relied upon the Project's impact on the local economy in issuing the ESD. (Mot. 21.) Plaintiffs rely on language in the Pacific Southwest Region's August 11, 2010 ESD request as support for this argument, which references the effect a delay in Project implementation would have on the local economy. (AR 502 at 1.)

Although the August 11, 2010 request does discuss the delay's impact on the local economy, the Emergency Situation Determination was not based on this part of the request. The ESD specifically states that the delay's impact on the local economy "is not part of what defines an emergency situation . . . and is not a basis for [the] determination." (AR 501 at 2.) Therefore, the delay's impact on the local economy was not included as a basis for issuance of the ESD.

### e)   The 2009 ESD

Lastly, Plaintiffs argue the economic analysis included in the 2009 ESD proved to be untrue, and therefore undermines the economic justification in the current ESD. (Mot. 21:25-22:11.) Plaintiffs state:

> In 2009, the Forest Service alleged that immediate implementation of the Panther project was necessary in order to implement the project that year, or else the government could loose as much as $312,000 because there was a significant risk of the project drawing no bids. Now, in 2010, the Forest Service now maintains that those estimates were all incorrect, and that implementation in 2010 would still capture the economic value of the timber . . . . . This acknowledgment casts serious doubt on the veracity of the agency's 2009 claim that an ESD was necessary to expedite implementation of the Panther project. . . . [I]ts claim, now, that an ESD is still necessary in 2010 and that implementation in 2011 would result in no bids, is questionable at best.

(Mot. 21:25-22:16.)

1  Defendants counter the economic analysis contained within the

2  2009 ESD does not undermine the current ESD, arguing:

3  [T]he fact that the timber in the Project Area has
   retained some value is consistent with the
4  principles the Agency properly relied upon in its
   ESD analysis: fire-damaged timber deteriorates over
5  time, with the biggest losses occurring within the
   first two years. Moreover, as time goes on, it is
6  increasingly likely that no salvageable value will
   be left. The Forest Service's ESD and supporting
7  analysis is more than sufficient to withstand
   scrutiny.

8

9  (Opp'n 20:23-21:7 (citations omitted).)

10  Defendants' arguments are persuasive. The 2009 ESD did not

11  state that no commercial bids would be possible if the project were

12  delayed. (Mot., Ex. B at 1.) Instead, it indicated the delay would

13  result in a loss of timber value and "significantly increase the

14  likelihood of receiving no bids." Since the timber's value has further

15  decreased since the 2009 ESD was issued, the 2009 ESD's underlying

16  analysis, i.e. that fire-killed trees deteriorate in value over time,

17  proved to be true. Id.

18  Therefore, Plaintiffs have not raised a substantial question

19  on whether the ESD was properly issued. Furthermore, Plaintiffs did not

20  challenge the second, independent basis for the ESD in this case - that

21  immediate implementation is necessary for relief from hazards

22  threatening human health and safety. (AR 501 at 1 (stating "this project

23  qualifies as an emergency situation as defined at 36 CFR 215.2 because

24  its immediate implementation is necessary for relief from hazards

25  threatening human health and safety, and to avoid substantial loss of

26  economic value to the government").)

27  As explained in the Panther Fire Salvage Emergency Situation

28  Analysis:

Forest roads in the project area provide access for forest management and public use. . . . Unstable snags along these roads present a safety hazard to all who use the roads. Safe public ingress and egress is, therefore, a major concern. Unstable snags along the roads and in stands also present a hazard to the public, to forest workers in general and to firefighters in particular. Current Forest Service Wildland Fire Use policy has led to less immediate suppression of many wildfires (USDA Forest Service 2004a) . . . . For wildland firefighters to initiate suppression actions, they need safe access to the area. In the Panther Fire area, the current heavy fuel loadings and overhead snag hazards present unsafe conditions. Salvage harvest followed by treatment of natural and activity fuels would reduce existing and future fuel loads while reducing the overhead snag hazard. While salvage harvest would reduce heavy fuel loads, subsequent fuel treatments would reduce future fire behavior within the treated areas, thus providing suppression forces an opportunity to initiate suppression actions. With the history of frequent wildfires in and adjacent to the project area, the existing roads provide an opportunity for firefighters to safely access the area and engage in suppression actions. Effective suppression actions are important in reducing the risk of unwanted wildfires exiting the Marble Mountain wilderness and threatening more populated areas near Happy Camp. In addition, forest visitors, firefighters and other forest workers need safe egress from the area in the event of a wildfire. For the roads to be effective avenues of egress in the event of a wildfire, activity and natural fuels need to be treated following the removal of hazard trees.

(AR 505 at 3.)

For the stated reasons, Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of their ARA claim.

**B.    Irreparable Harm / Balance of the Equities / Public Interest**

Since Plaintiffs have failed to show a likelihood of success, or raise a serious question, on the merits of any of their claims, the Court need not address the three remaining <u>Winter</u> factors, i.e. whether Plaintiffs are likely to suffer irreparable harm in the absence of

preliminary relief, the balance of equities tips in their favor, and a preliminary injunction is in the public interest. See Doe v. Reed, 586 F.3d 671, 681 n.14 (9th Cir. 2009).

### IV.  CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction is DENIED.

Dated:  October 8, 2010

_____
GARLAND E. BURRELL, JR.
United States District Judge