IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, ENVIRONMENTAL PROTECTION INFORMATION CENTER, KLAMATH FOREST ALLIANCE, and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>        Plaintiffs,<br><br>    v.<br><br>PATRICIA A. GRANTHAM, Klamath National Forest Supervisor; and UNITED STATES FOREST SERVICE,<br><br>        Defendants,<br><br>    and<br><br>SOUTH BAY TIMBER, LLC; and ROUGH AND READY TIMBER, LLC,<br><br>        Defendant Intervenors. | 2:10-cv-02350-GEB-CMK<br><br><u>ORDER DENYING PLAINTIFFS' MOTION FOR STAY AND INJUNCTION PENDING APPEAL</u> |

Plaintiffs move under Federal Rule of Civil Procedure ("Rule") 62(c) for a stay and injunction enjoining "additional post-fire logging activities in the Panther Project area" pending appeal of the order denying their motion for preliminary injunction. (Pls.' Mem. in Supp. of Mot. for Stay ("Mot.") 1:14-17.) Plaintiffs argue "irreparable harm is occurring, and will continue to occur, in absence of a stay and injunction pending appeal." Id. at 1:11-12. Defendants and Defendant Intervenors filed oppositions to the motion on October 19, 2010.

1

## I. LEGAL STANDARD

Rule 62(c) prescribes: "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, dissolves or denies an injunction, the court may suspend, modify, restore, or grant an injunction . . . " However, a stay pending appeal "is not a matter of right, even if irreparable injury might otherwise result." Nken v. Holder, 129 S. Ct. 1749, 1760 (2009). "It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case.  The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 1761 (quotation, citations and internal brackets omitted).

The following factors should be considered in deciding whether to issue a stay pending appeal:

> "(1) [W]hether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

Golden Gate Restaurant Ass'n v. City and County of San Francisco, 512 F.3d 1112, 1115 (9th Cir. 2008) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). The Ninth Circuit applies these factors by "employ[ing] two interrelated legal tests that represent the outer reaches of a single continuum." Id. at 1115 (quotation omitted).

> At one end of the continuum, the moving party is required to show both a probability of success on the merits and the possibility of irreparable injury. . . . At the other end of the continuum, the moving party must demonstrate that serious legal questions are raised and that the balance of hardships tips sharply in its favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable

>  harm increases as the probability of success decreases.

Id. at 1115-16 (quotations omitted). For purposes of injunctive relief, "[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." Gilder v. PGA Tour, Inc., 936 F.2d 417, 422 (9th Cir. 1991) (quotations and citations omitted).

"There is substantial overlap between these and the factors governing preliminary injunctions . . . because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." Nken v. Holder, 129 S. Ct. at 1761.

## II.  DISCUSSION

### A.  Likelihood of Success on the Merits

Plaintiffs' motion to stay is based on the same three claims on which their preliminary injunction motion was premised: violation of the National Forest Management Act ("NFMA"); violation of the National Environmental Policy Act ("NEPA"); and violation of the Appeals Reform Act ("ARA"). (Mot. 1:14-19.)  This ruling on Plaintiffs' Rule 62 motion only addresses Plaintiffs' arguments or citations to the Administrative Record ("AR" or "record") that have been made for the first time in the motion sub judice, and does not repeat discussion of issues specifically addressed in the preliminary injunction order.

#### 1.  NFMA Claim

Plaintiffs contend "the Forest Service overlooks the fact that natural regeneration is already occurring in the planning area and within Riparian Reserves," as support for their argument that the Project violates the National Forest Management Act by logging within Riparian Reserves when not required to meet Aquatic Conservation

3

Strategy ("ACS") Objectives. (Mot. 4:6-7.) Plaintiffs explain, "[c]onsequently, even if the Forest Service could lawfully focus on conifer regeneration as a means to attain ACS Objectives, natural regeneration and the successional process of restoring riparian conditions is already underway." Id. at 4:8-10.

However, the record evidences the Forest Service's recognition that natural regeneration is occurring in a manner that will delay conifer regeneration. (AR 19 at 6, 46, 50-51, 126.) The Environmental Assessment states:

> **Conifer Revegetation**
>
> . . . .
>
> **Alternative 1 – No Action**
>
> Under this alternative no change from current management actions would occur in the project area. Sprouting hardwoods and highly competitive sclerophyllous brush species would quickly occupy most of project area. Reforestation will occur naturally but may take many decades to replace brushfields. . . . Given the high residual fuel loading, probable length of time required for site dominance by conifers and the fire history of the Klamath Province, it is likely that the area would reburn before trees with some degree of fire resistance were established, so the area may go through extended cycles of dominance by hardwoods and sclerophyllous brush. . . . [delaying] site occupancy by conifers for decades . . . .
>
> The project silviculturist determined that the No Action alternative may meet the purpose and need in that conifer re-establishment would not be precluded. However, given the current lack of a viable seed source in and surrounding the project area, and the current and predicted future fuel loads, site dominance by conifers could take decades and would likely be interrupted by periodic reburns that set back natural conifer regeneration.
>
> **Alternative 2 – [The Project]**
>
> The proposed action would regenerate stands in the project area by salvaging merchantable trees

4

> where appropriate on approximately 214 acres; treating fuels by yarding unmerchantable material, handpiling and pile burning; and planting appropriate conifer species with follow-up manual brush control. . . .
>
> Reforestation has a high probability of successfully re-establishing conifers on site within five years. . . . With active reforestation the site would likely reach the stage where conifers dominate the site several decades sooner than with no management. While natural regeneration has been successful following fires in the Klamath Province, long regeneration periods and highly variable stocking have characterized unplanted sites.
>
> Under the proposed action, it is likely that 214 acres would meet minimum stocking requirements within five years following project activities. The project silviculturist concluded that implementation of the proposed action would meet Forest Plan direction related to reforestation of conifer species, and that adequate stocking by conifers would likely be achieved much sooner than under no action.

Id. at 50-51 (citations omitted).

Plaintiffs also argue "the Forest Service acknowledges that coarse woody debris needs are not being met," citing a portion of the notes taken during the Project's January 21, 2010, Interdisciplinary Team Meeting. (Mot. 4, n.2.)

The portion of the record Plaintiffs cite states, "Leslie - we are in deficit with the 5 trees per 200 feet, so we will probably be okay fuels-wise." (AR 427, at 3.) It is unclear what the cited portion of the record means since it is only a part of the "Panther IDT Meeting" notes. Additional notes from the same meeting provide context for the attendees' discussion of coarse woody debris:

> Big sugar pine in Riparian Reserves (RRs) may be cut, but will they be felled and left or will they be removed? Bill Snavely reiterated the design features for commercial "sticks", hazard trees in

5

> RRs felled can serve as CWD and be left on site to meet other resource needs. Treatment of fuels within RRs is more important along the road system than within the units. Betsy asked if CWD requirements have to be met on every acre; Bill Snavely says they need to be met on a watershed level. Nick thinks that we won't get public support if we remove all fuels from RRs as part of the roadside hazard treatment. While the CWD discussion will be at the watershed level, implementation of CWD retention will be on the RR level.
>
> The downed trees in RRs are at least in some places trapping granitic debris flow and keeping it from washing down the entire RR. Joe –hazard trees can be felled into streamcourses to provide CWD. Hazard trees leaning away from the streamcourses can be removed. Leslie - there are so many downed trees that overall there is not an overwhelming need for directional felling. . . .
>
> Leslie - we are in deficit with the 5 trees per 200 feet, so we will probably be okay fuels-wise. Hazard trees in RRs adjacent to streams will be felled into the streamcourse when needed to meet the 5 trees/200 feet of streamcourse.

(AR 427 at 3.) Further, regardless of its meaning, the cited notation was made at the Project's first interdisciplinary team meeting, before the Project's Hydrology Report, Geology Report, Soil Report and Biological Evaluation/Assessment documented that coarse woody debris needs are being met within the Project area. (AR 6 at 7; AR 7 at 21; AR 35 at 3-4 and Table 5; AR 39 at 28.) As stated in the Soil Report,

> Coarse woody debris (CWD) or downed logs are an important component of coniferous forest ecosystems. They can account for up to 50% of the organic matter on the forest floor in Douglas fir forests. Existing levels of CWD are an interaction between past fires, past management activities and the age of the existing vegetation. The existing coarse woody debris ranged from 2.9 to 7.8 logs per acre and averaged 5.4 logs per acre (Table 5). Some units had a high number of logs due to the directional felling of trees in the bottoms of numerous steep sided swales that took place in November 2008 as part of the BAER project to reduce the flow of sediment and debris in stream channels.

(AR 35 at 3-4.)

For these reasons, and the reasons set forth on pages 6 to 12 of the October 8, 2010, Order Denying Plaintiffs' Motion for Preliminary Injunction ("Order"), Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of their NFMA claim.

### 2. NEPA Claim

Plaintiffs cite additional portions of the record as support for their argument that the Project required an Environmental Impact Statement because of its implementation within Late-Successional Reserves ("LSR") and the Johnson Inventoried Roadless Area ("IRA"). (Mot. 9:11-10:9.) However, Plaintiffs' additional citations do not demonstrate that the Project will significantly affect these land allocations. (AR 19 at 69; AR 339 at 36-37.) For example, Plaintiffs cite to the following portion of the Environmental Assessment as support for their argument that the Project may significantly affect LSR's:

> Postfire timber harvest can compound the original impacts to the habitat from the fire, whether they are negative or positive (Hutto 1995, Hutto and Gallo 2006, Caton 1996, Saab and Dudley 1998, Hanson and North 2008). *Post-fire salvage logging and harvest of hazard trees alongside roads removes snags that provide breeding, roosting, and foraging habitat for many snag-associated species. Salvage logging influences densities and relative abundances of some non-cavity nesting birds and cavity-nesting birds directly within the impacted areas.*

(Mot. 9:15-20 (citing AR 19 at 69) (emphasis in original).) The cited language is found within the Environmental Assessment's discussion of the Project's potential cumulative effects on wildlife. Id. It concerns post-fire logging's effects on management indicator species generally, not this Project's effects within LSR's. Id. Further, the paragraphs which follow the cited section indicate:

7

> [The Project's salvage harvest] . . . may impact some individuals, but the small area affected likely would have no impact on populations or population trends across the larger area[, and r]oadside hazard tree removal . . . would have a negligible impact on snag numbers across the landscape. The threshold at which post-fire removal of trees, in addition to fire-caused mortality, has no limiting effects on overall availability of post fire habitat is unknown but is unlikely to be met by [the Project] due to the abundance of severely burned habitat outside of proposed treatment units that will remain unharvested.

(AR 19 at 69.)

The portion of the record on which Plaintiffs rely in support of their contention that the Project may significantly impact the Johnson IRA is similarly misplaced. Plaintiffs cite a quotation from their own June 14, 2010, Comments on the Project's Environmental Assessment. (Mot. 9:24-10:5 (citing AR 339 at 36-37).) The cited quotation appears to have been taken from the Appendix to the Environmental Impact Statement associated with the Klamath National Forest LRMP. (AR 339 36-37.) The Klamath National Forest LRMP Environmental Impact Statement was prepared in the 1990's and is not part of the record. (AR 517 at 7.) Moreover, the quotation does not concern this Project's effects within the Johnson IRA.

Plaintiffs also argue an Environmental Impact Statement is required because "short-term visible disturbances" created by the project are "inconsistent with visual quality requirements." (Mot. 10:10-17.) However, the Project's Environmental Assessment analyzed the anticipated effects on scenery and recreation, and found neither would be significantly affected. (AR 19 at 139-140; AR 33 at 2, Table 2.) For example, the Environmental Assessment states:

> [The Project] would result in a temporary closure of project area recreation trails and their road access, in order to protect public visitors from safety hazards associated with the existing

> post-wildfire condition and project activities. This alternative would create numerous short-term, strong to moderate-intensity scenery disturbances, but the proposed fuels activities would more rapidly achieve a conifer-dominant scenic character (about 100 years) than [the no action alternative]. The proposed treatments would reduce the intensity of future wildfires and their scenery effects in the treated areas, thus allowing the scenic conifer canopy to promptly re-establish. The removal of existing and imminent fuels would also benefit viewshed scenery through more historic, mosaic-like burn patterns expected from future wildfires. However, [the Project] would also create and expand upon existing strong viewshed disturbances lasting 10-25 years. Scenery, Recreation and WSR effects of Alternative 2 are not considered significant. While they may be moderately adverse in the short term, they are also moderately beneficial in the long term.

(AR 19 at 139-140.)

For these reasons, and the reasons on pages 12-18 of the October 8, 2010 Order, Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of their claim that an Environmental Impact Statement was required for the Project.

### 3. ARA Claim

Plaintiffs present further argument analogizing the Project's Emergency Situation Determination ("ESD") to the ESD at issue in Alliance for the Wild Rockies v. Cottrell as support for their position that "the Forest Service has provided no explanation for why it could not have provided the public with a stay pending administrative appeal. . . ." (Mot. 14:9-18 (citing Alliance for the Wild Rockies v. Cottrell, 613 F.3d 960 (9th Cir. 2010).) Specifically, Plaintiffs argue "[a]s in Cottrell, the Forest Service issued an ESD for the Panther fire two years after the wildfire. There is no information that suggests that a two-year lag between the wildfire and the ESD constitutes an "emergency." Id. at 14:14-16. Plaintiffs explain:

> The Panther fire was declared out in Fall 2008. By August 2009 – almost a year later – the Forest Service had made a decision to log the Panther fire, and, in response to litigation, withdrew its decision later that month. The administrative record in the present case indicates that the agency held no meetings or correspondences or discussions of any kind about proceeding with the Panther project until January 21, 2010. There is nothing in the record explaining why the agency waited for more than 5 months to resurrect the Panther project.
>
> Once the agency did begin work on the revised Panther project, the Forest Service noted that changes to specialists reports should be minimal, so presumably not much new analysis was required. . . . [T]he Forest Service held its last internal meeting about the Panther project in February 2010. After February 2010, there is no indication in the administrative record that agency staff met to discuss the project.
>
> Plaintiffs are cognizant that agency timelines can slip, due to a variety of factors. However, in this case, the Forest Service waited 5 months to begin repackaging the Panther project (August 2009 to January 2010), and then appears to have waited another 6 months (February 2010 to August 2010) to issue a decision on the revised project. There is nothing in the record explaining this delay.

(Mot. 12:19-13:14 (quotations, citations and internal brackets omitted).)

The five and six month gaps in Project activity Plaintiff describes are not reflected in the record. The record demonstrates that the 2009 Panther Project was withdrawn on August 31, 2009. (AR 505.) The current iteration of the Project was discussed at a "Klamath monitoring meeting" on November 10, 2009, less than three months later. (AR 471.) The Project's Interdisciplinary Team held its first meeting on January 21, 2010, and Project specialists prepared their reports from February 26, 2010 to May 17, 2010. (AR 20-40; AR 427.) The Environmental Assessment was made available for public comment on May 17, 2010, and the Klamath National Forest Supervisor requested an ESD on July 23,

10

2010. (AR 3, 504.) The Decision Notice/Finding of No Significant Impact and ESD were both issued on August 23, 2010. (AR 7, 501.)

Further, the Panther Fire Salvage Emergency Situation Analysis prepared in support of the ESD request explains why an ESD was not requested earlier for this Project:

> Requesting an ESD in 2010 for the Panther Fire Salvage and Reforestation Project was not initially planned due to the anticipated loss of timber volume and value due to two years of deterioration. In May 2010, a local timber sale purchaser examined the timber in the project, however, and indicated that, while significant deterioration had occurred, there was still value to be recovered in the material and requested the Happy Camp/Oak Knoll Ranger District sell the material via a timber sale contract versus paying for its disposal using a service contract.

(AR 505 at 8.) Therefore, unlike the ESD in Cottrell, this Project did not involve an unexplained two year delay in issuing an ESD post-fire. Alliance for the Wild Rockies v. Cottrell, --- F3d. ----, 2010 WL 3665149, at *11 (9th Cir. 2010).

Plaintiffs also argue the ESD was improperly issued in this case because "the administrative record does not support the agency's contention that [a projected loss] of $278,000 is significant, given the overall budget of the Forest Service or the federal government as a whole." (Mot. 22-25.) Plaintiffs state the Forest Services' budget for Fiscal Year ("FY") 2011 is approximately $5.37 billion dollars, citing a federal government website. (Mot. 16:20-21.)

Defendants counter that the Forest Service FY 2011 budget is irrelevant to the Project's ESD since "the Klamath National Forest must make do with only those appropriations that are allocated to it. It does not matter that the entire Forest Service . . . may have other funds."

11

(Defs.' Mem. of Law in Opp'n to Mot. for Stay and Inj. 5:12-15 (citation omitted).)

Plaintiffs present a single figure, the FY 2011 appropriation to the National Forest Service, in support of their argument that a projected loss of $278,000 is not "significant." However, they have not shown that this is the relevant budgetary consideration in evaluating the financial impact of a project's delay on the federal government. Therefore, Plaintiffs have not demonstrated that Thomas Tidwell, Chief of the Forest Service, was arbitrary in finding that "[d]elay would also result in a loss of timber value estimated at $278,000 and likely loss of the total sale revenue of $565,000 a substantial loss of economic value to the Federal Government." (AR 501 at 2.)

For these reasons, and the reasons on pages 18-26 of the October 8, 2010 Order, Plaintiffs have not shown a likelihood of success, nor raised serious questions, on the merits of claim that the Project's ESD was improperly issued.

**B.  Irreparable Injury / Comparison of Hardships / Public Interest**

Since Plaintiffs have failed to show a likelihood of success, or raise a serious question, on the merits of any of their claims, the Court need not address the remaining factors. See Mount Graham Coalition v. Thomas, 89 F.3d 554, 558 (9th Cir. 1996).

**III.  CONCLUSION**

For the stated reasons, Plaintiffs' motion for a stay and injunction pending appeal is DENIED.

Dated: October 19, 2010

_____
GARLAND E. BURRELL, JR.
United States District Judge